ISAAC H. WORDIN *vs.* STEPHEN C. BEMIS AND OTHERS.[*]

Demurrage strictly is money due by express contract for the detention of a vessel in loading or unloading one or more days beyond the time allowed for that purpose by the charter-party. General assumpsit will lie for it.

Damages in the nature of demurrage are recoverable for detention beyond a reasonable time in unloading only, and where there is no express agreement to pay demurrage. They are for a breach of the implied contract of the shipper that he will receive the goods in a reasonable time after the arrival of the vessel. Assumpsit will lie, but being for unliquidated damages it must be special.

Where a master of a vessel runs the vessel on shares, pays all expenses and has entire control of her course of employment, and makes all contracts with regard to the same in his own name and on his own behalf, he is *pro hac vice* owner of the vessel, and can maintain an action in his own name for damages in the nature of demurrage.

In all cases of shipment, where there is no specific agreement between the shipper and carrier in respect to the particular place at the port of destination where the cargo shall be landed, nor any known custom of the port, the shipper or his agent must be there ready to receive it on notice of the arrival of the vessel.

On failure of the shipper to make such provision for receiving the cargo, the carrier is at liberty to treat the contract as broken, and land the cargo at the usual place, if there be one, or procure a suitable place at the shipper's expense, or he may wait for the shipper to appear and rely on obtaining compensation for the delay in an action for breach of the implied contract to receive in a reasonable time.

Where by a bill of lading a cargo is to be delivered at the dock of a railroad company for transportation by railroad to the interior, the shipper is liable, in the absence of any stipulation to the contrary, for the neglect of the railroad company to receive the cargo within a reasonable time.

It is a well settled rule that vessels with cargoes to be delivered at the same dock must take their turn in being discharged.

The owners of such a road and dock are not bound to make provision for an accidental and extraordinary accumulation of vessels.

ASSUMPSIT, for freight, and for damages in the nature of demurrage. The declaration contained one general count, one special count in which a promise to pay the damages as a debt was stated, and a special count for unliquidated damages. The case was tried to the court on the general issue with notice, and the following facts found.

The plaintiff was the master of the schooner Niagara, at the time in question, and had been for a long time previous, the

[*] This case was argued at an informal meeting of the judges at New Haven some time after the regular term. All the judges were present.

vessel being owned by one Thompson. The plaintiff had made a contract with Thompson by which the latter was to have two-fifths of the earnings of the vessel, he paying two-fifths of the port charges; and the plaintiff was to have the entire control of the vessel, take the remaining three-fifths of the earnings, and pay all other expenses. The plaintiff took possession of the vessel under the agreement, and had the entire control and management of her, and was running her under the agreement at the time in question.

The defendants resided at Springfield, in the state of Massachusetts, and were large dealers in iron and coal. The plaintiff took on board his vessel, at Elizabethport, a cargo of coal, consigned to the defendants, on the seventeenth day of October, 1862. There was no other contract regarding the transportation of the coal than the bill of lading, which was as follows :—
"No. 287. Shipped by C. E. Detmold, in good order, on board the good schooner Niagara, of Bridgeport, whereof Wordin is master for this present voyage, and now lying in the port of Elizabethport, and bound for New Haven, Connecticut, one hundred and eighty-three tons of 2,240 lbs. Spring Mountain Lehigh coal, which I promise to deliver at the aforesaid port of New Haven, in like good order (the dangers of the seas only excepted,) unto S. C. Bemis & Co. (Springfield,) or their assigns, he or they paying freight for the same, at the rate of ninety cents per ton. In witness whereof the master or purser of the said vessel has affirmed to three bills of lading, all of this tenor and date; one of which being accomplished, the others to stand void. Dated at Elizabethport, this 20th day of October, 1862. 173 tons in the hold, 10 tons on deck.
I. H. WORDIN."

The defendants, on receiving the bill of lading by mail, enclosed it to R. S. Dowd, at New Haven, who was the freight agent there of the New Haven, Hartford & Springfield Railroad Company, with the following letter : "Springfield, Mass., Oct. 22, 1862. R. S. Dowd, Esq., Ag't, New Haven: Dear Sir: Enclosed we hand you bill lading of schr. *Niagara,* with 77 tons egg and 106 tons stove size coal, total 183 tons, from Elizabethport to New Haven, freight 90 cents per ton. On

arrival weigh four cars of each size and forward the whole cargo to us at Springfield, unless we advise you to the contrary. Yours respectfully, S. C. BEMIS & Co."

The plaintiff arrived with the cargo at Belle dock, the dock of the railroad company in the city of New Haven, on the 22d of October, 1862, and immediately notified Dowd, the freight agent above named, of his arrival, and requested to be discharged. Dowd had the entire control of Belle dock, and all the facilities for discharging coal. Those facilities were equal to the discharging of seven vessels at the same time, and were sufficient to meet the wants of the public in all ordinary times. When the plaintiff arrived at Belle dock, and was ready to be discharged, it happened that twenty vessels laden with coal, and four with other freight, were lying there, ready to be discharged, and waiting each her turn. The railroad company had made an inflexible rule to discharge vessels in the order of their arrival, and the rule was rigidly enforced by Dowd in all cases, and he refused to discharge the plaintiff until his turn should come in accordance with the rule. On the 24th of October the plaintiff entered a protest in due form of law, and sent a copy of the same to the defendants, and sent likewise a letter, both which the defendants received in due course of mail. The letter was as follows:—" New Haven, Oct. 24th, 1862. S. C. Bemis & Co.: Dear sirs: I have at this port a cargo of coal consigned to you, which I am ready and anxious to deliver, and to receive my freight thereon, but which your agent here will not receive till it suits his convenience. This is to notify you that I shall hold you and the coal responsible for my detention here, while the same continues, at the rate of $20 per day. I have this day made a protest in the premises, setting forth the above and other facts of the voyage. Yours, ISAAC H. WORDIN."

To this letter the defendants sent no reply, but wrote to Dowd urging him to forward the coal. The plaintiff remained with his vessel at Belle dock eight days before his turn came, when he was discharged. During this time the railroad company did all they could reasonably do to hasten the discharge of the vessels that were prior in order of time to the plaintiff's.

The superior court found the amount due as freight, and the amount of the damages in the nature of demurrage, and reserved the questions with regard to the latter for the advice of this court.

*Treat* and *Blake*, for the plaintiff.

1. The defendants are liable to the plaintiff for the damages caused by the detention of his vessel. His contract was "to deliver at the port of New Haven." He was not bound under this contract to unload at any particular place. *Chickering* v. *Fowler*, 4 Pick., 371. Even if a particular dock had been designated in the bill of lading the defendants would have been bound to be there, by themselves or by an agent, to receive the cargo immediately, and if they were not so ready to receive it and the plaintiff could not conveniently discharge it there, he would have a right to go to the nearest convenient dock and there discharge. *Clendaniel* v. *Tuckerman*, 17 Barb., 184. Here the defendants appointed Dowd as their agent to receive the coal, and the Belle dock was the usual place of discharging freight for the railroad to Springfield. When therefore the plaintiff arrived at this dock and notified Dowd, he had done his whole duty. The defendants had for their own convenience selected a place of delivery that involved special delay, and they are answerable for the delay thus caused. Abbott on Shipping, 307; *Horn* v. *Bensusan*, 9 Car. & P., 709; *Randall* v. *Lynch*, 2 Camp., 356; *Randall* v. *Lynch*, 12 East., 179; *Robertson* v. *Bethune*, 3 Johns., 342; *Clendaniel* v. *Tuckerman*, 17 Barb., 184; 1 Parsons Mar. Law, 261, 262, and notes. If it be said that the plaintiff took his risk of delays, yet it was clearly only of usual delays, while the delay from the necessity of waiting one's turn for unlading was a special delay and could not have been anticipated. *Nichols* v. *Tremlett*, Sprague's Decisions in Admiralty, 362. But not only are the defendants bound to pay by implication of law, but are to be regarded as having expressly promised to pay. We notified them immediately that if detained we should charge them $20 per day for the detention, and they returned no reply, leaving us to infer their

assent to the charge, and thus leading us to wait, instead of storing the coal as we had a right to do.

2. Special assumpsit is the proper form of action. The claim is for unliquidated damages for the defendants' breach of contract. *Horn* v. *Bensusan*, 9 Car. & P., 709; *Clendaniel* v. *Tuckerman*, 17 Barb., 184; *Robertson* v. *Bethune*, 3 Johns., 342; *Brouncker* v. *Scott*, 4 Taunt., 1. *Evans* v. *Forster*, 1 Barn. & Ad., 118.

*F. Chamberlin*, for the defendants.

1. In the absence of any express agreement for demurrage, case and not assumpsit is the proper remedy. *Kell* v. *Anderson*, 10 Mees. & Wels., 500. There can at any rate be no recovery on the plaintiff's declaration as it stands. The first count is general and intended only for the freight; the second is for "the use of a schooner kept and retained by the defendants," which there is no evidence to support; and the third alleges no promise to pay demurrage, and is besides bad for duplicity.

2. The plaintiff can not sustain the suit in his own name. He is merely master and part owner. As master he could sue for demurrage proper, as he would be the party with whom the contract for demurrage would have been made, but an action for damages in the nature of demurrage can only be brought by the owners as such. 3 Kent Com., 278; *Evans* v. *Forster*, 1 Barn. & Ad., 118; *Brouncker* v. *Scott*, 4 Taunt., 1; *Clendaniel* v. *Tuckerman*, 17 Barb., 190.

3. The defendants can be liable only for a failure to receive the coal with reasonable despatch. The delay was caused by the application of a necessary and reasonable rule, adopted by the railroad company, for the discharging of vessels in their turn. It is found that the facilities furnished by the railroad company were sufficient for the wants of the public at all ordinary times, and that the accumulation of vessels at this time waiting to be discharged was an extraordinary one. The rule of taking vessels in their turn is manifestly a reasonable one and the only fair one, and it has been repeatedly approved by the courts. *Harris* v. *Dreesman*, 25 Eng. L. & Eq., 526,

529 ; *Robertson* v. *Bethune*, 3 Johns., 342; *Strong* v. *Carrington*, Am. Law Reg., March, 1863, p. 287 ; *Cross* v. *Beard*, 26 N. York, 85 ; *Rodgers* v. *Forresters*, 2 Camp., 483 ; *Burmester* v. *Hodgson*, id., 488. It is also laid down in several of these cases that the obligation to discharge the vessel which is implied in the contract of shipment, is only that she should be discharged "in the usual and customary time," which means of course the usual and customary time at the place where she is to be discharged.

BUTLER, J. The objection to the sufficiency of the declaration must be overruled.

Demurrage, in the strict sense of the term, means a sum of money due by express contract for the detention of a vessel in loading or unloading, one or more days beyond the time allowed for that purpose in the charter party. As it is a certain sum, due by force of an express contract, general assumpsit will lie for it.

Damages in the nature of demurrage, are recoverable for detention beyond a reasonable time, in unloading only, and where there is no express stipulation to pay demurrage. They are in the nature of demurrage because they are for a detention of the vessel, and measured by the day like demurrage, and are damages because they are recovered for a breach of the implied contract of the shipper that he will receive the goods in a reasonable time. Assumpsit will lie for them, because resulting from a breach of contract, but the count must be special, as for unliquidated damages in other cases of breach of an implied contract. The plaintiff can not therefore recover on either of the two first counts of the declaration, for he declares in both for a certain sum as a *debt*. The third count is special for damages, and sets forth every material *fact* which the plaintiff is bound to prove in order to recover, or the defendant to answer in order to defend. But the plaintiff has omitted to allege the implied promise to receive the coal in a reasonable time, the breach of which is the foundation of the action. The defect in that count is not, as the defendants suppose, an omission to allege a promise to

pay damages or demurrage for detention, but an omission to state the promise to receive the goods in a reasonable time, which the law implies from the facts stated, and which is usually averred. Whether that count is demurrable by reason of that omission or for duplicity we need not inquire. The defendants have not demurred and can take nothing from their present objection.

The second objection must also be overruled. It has been holden in England that the master of a vessel, as such, can not recover damages in the nature of demurrage. *Brouncker* v. *Scott*, 4 Taunton, 1. The correctness of that decision has been questioned. In *Evans* v. *Forster*, 1 Barn. & Ad., 118, the decision was followed by Lord Tenterden " as the safest and wisest course," and such is the law there. In this country the law is not settled, nor is it necessary to decide the question in this case. The plaintiff ran this vessel on shares, paid all expenses and had entire control of her course of employment, and made all contracts in respect to her employment in his own name and on his own behalf. He was *pro hac vice* owner, and can maintain his action as such.

The defendants insist, in the third place, that the detention was not their fault. It is not pretended that it was the fault of the plaintiff. He was there ready and anxious to discharge, and the defendants knew it. The railroad company were not ready to receive, and the defendants say that the company were not their agents. But in this too they are wrong. In all cases of the transportation of cargoes by water, when there is no specific agreement between the shipper and carrier in respect to the particular wharf or spot at the port, where the cargo should be landed, or any known custom of the port, the shippers or their agents must be there ready to receive it on notice of the arrival of the vessel. In this case there was no such custom, and no specific agreement. It is found that the bill of lading was the only contract made between the parties in respect to the transportation of the coal and that is silent on that point. It was then the duty of the defendants to be there or have an agent there to receive it or find some convenient spot where it could be deposited in a reasonable time, and

on their failure to do so, or of the agent to receive, the plaintiff was at liberty to treat the contract as broken, land the cargo at the usual place if there was any such, or procure a suitable place at the expense of the defendants, or wait the tardy movements of the defendants or their agents, and rely on obtaining compensation in this action for breach of the implied contract to receive in a reasonable time. He chose the latter alternative. And now it does not lie in the mouths of the defendants to say that the company were not their agents. The facts found clearly indicate that he was directed to deliver at Belle dock, and that was the dock of the railroad company. It is insisted that the railroad company were mere intermediate carriers, and the plaintiff should be held to have assumed the risk of their delay in receiving the coal, and that such should be the rule in all such cases. This claim is novel. It is not supported by authority, but is argued and urged upon principle. It is not well founded. The contract of the plaintiff, and as the court finds the only one, is contained in the bill of lading. That requires him to deliver, not to the railroad company or any intermediate carriers as such, but in terms "at the aforesaid port of New Haven, *unto S. C. Bemis & Co.*, (Springfield,) or their assigns." The word "Springfield" is *descriptio personarum*, inserted to identify the defendants by their place of residence. The plaintiff did not contract to deliver to the railroad company, nor did the railroad company contract with him expressly or impliedly to receive it in a reasonable time, and the defendants did. There is no fact or principle of law which can place him or the defendants in any other position with respect to each other, or third persons, than that in which they placed themselves by the bill of lading. Moreover the bill of lading impliedly bound them to be there or have an agent there, ready to receive the cargo, and if they were not there, and the railroad company were not their agents, their contract was not performed.

Whether it would be well or not that shippers should guard against the consequences resulting from the unreasonable delay of intermediate carriers in receiving goods, and how they could do it, we need not inquire. It is obvious that if

they desire to transfer the risk of detention to the carrier by whom they first ship, they must make a different contract from that made in this case. Perhaps a bill of lading which called for a delivery to a railroad company, as intermediate carriers for conveyance, might be framed to import that the first carrier assumed the risk of receipt by the intermediate carrier in a reasonable time, and preclude the implied obligation to receive themselves or by an agent. That implication must be precluded. But would the intermediate carriers in such case be liable to the first, if they did not refuse to receive, but did neglect to receive in a *reasonable time?* And suppose they should refuse to receive at all, what then would be the condition of the first carrier? There are other difficulties which might be suggested, but it will be time enough to consider them when a case is presented which calls for their consideration. It is very clear that this does not.

The defendants further insist that if the railroad company were their agents, still they are not liable, for that the coal was in fact received in a reasonable time, and there was no breach of their implied contract. And this point is well taken and we must sustain it, though it may operate hardly upon the plaintiff.

There is an apparent equity in the case in favor of the plaintiff. Vessels are expensive—it is expensive to man and run them—the wear and tear is considerable—the coastwise business is one of hardship and exposure, and it is confined to a few months of the year—the remuneration is moderate and a considerable delay in port is ruinous. The delay in this particular case occasioned a loss exceeding, it may be, the earnings of the voyage or trip. In such a case the excuse for the delay should be satisfactory, and should be clearly shown, although it furnishes no reason for shifting the plaintiff's hardship upon the defendants if the latter were not in fault. The excuse in this case is, that the railroad company had facilities for the discharge of seven vessels at the same time, and that they were sufficient to meet the wants of the public in all ordinary times, but that there was an unusual accumulation of vessels at this time, and the plaintiff was discharged in turn.

The rule that vessels must take their turn in the order of their arrival is just and necessary, and too well settled to be disregarded. It is well settled also by numerous decisions, that the owners of such a road and dock are not bound to make provision for an unexpected and accidental accumulation of vessels, and the defendants are in no worse condition than they would be if the dock and road had been theirs. Influenced by the equity of the case I had at first some doubt whether the finding in respect to the excuse came up to the necessities of their defence. It is not found that the accumulation was owing to any *unexpected cause,* or that it might not have been foreseen and provided against by proper foresight and diligence. In several of the cases cited the vessels were detained by a storm or storms, and all arrived together when the weather cleared up. There the elements were the cause. Here the cause is not found, nor is it found that the accumulation was not the result of previous want of diligence or other fault on the part of the company. Still, it is expressly found that the company did all they could do to hasten the discharge of the vessels after the arrival of the plaintiff, and there is no presumption that they or the defendants expected or could have foreseen the arrival of so many vessels, or were in any way the cause of the accumulation, and we are constrained to hold the excuse sufficient.

It was intimated on the argument that the company required the vessels to be unloaded into their cars, and that there was vacant dock room where, in such an emergency, a part of the detained vessels might also have deposited their cargoes, involving additional expense to the company, but collectible from the owners, and far less than that entailed by the delay upon the plaintiff and others, and that it was the duty of the company to permit them under such circumstances so to unload. But no facts are found which raise that question, and we are not at liberty to consider it.

The superior court must be advised to render judgment for the plaintiff for the amount of his freight merely, and to reject the claim for damages in the nature of demurrage.

In this opinion the other judges concurred.