THREE CASES (UNITED STATES v.). See Case No. 16,496.

THREE CASES OF TOYS (UNITED STATES v.) See Case No. 16,499.

THREE HORSES (UNITED STATES v.). See Case No. 16,500.

THREE HUNDRED AND EIGHT CADDIES OF TOBACCO (UNITED STATES v.). See Case No. 16,501.

---

## Case No. 14,010.

### THREE HUNDRED AND EIGHTEEN AND ONE-HALF TONS OF COAL.

[14 Blatchf. 453;[1] 4 Law & Eq. Rep. 105; 44 Conn. 548.]

Circuit Court, D. Connecticut. May 20, 1878.

CARRIERS—IMPOSING CONDITIONS IN RECEIPT OF FREIGHT—REASONABLENESS.

The New Haven and Northampton Company, a railroad corporation, owning a dock at New Haven, refused to receive coal on its cars, on said dock, from a canal-boat lying thereat, unless the master of the canal-boat would employ shovellers designated by the company, at a price fixed by the company, which was intended to be, and generally was, the ordinary market price, to shovel the coal on board of the canal-boat into tubs belonging to the company, which tubs were then to be hoisted, by means of a derrick on the dock, so that the coal could be dumped into such cars. The canal-boat paid ten cents per ton to the company for the use of the tubs and machinery: Held, that the requirement of the company was not a reasonable one and could not be enforced.

This was an appeal from a decree of the district court in a suit in rem, in admiralty.

The decision of the district court (SHIPMAN, District Judge), was as follows:

"The New Haven and Northampton Company is a railroad corporation duly incorporated by the legislature of the state of Connecticut, and owning and operating a line

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

of railroad, for the transportation of persons and goods, from New Haven, Connecticut, to Northampton, Massachusetts. Said corporation is a common carrier, and a considerable portion of its regular business is the transportation of coal from New Haven to the various places upon the line of its railroad. This coal is brought from different coal ports to the port of New Haven, in coal barges, or in coal vessels, and is delivered to said railroad company upon its dock in said city, commonly called the 'Canal Dock.' About 140,000 tons of coal are annually received at this dock. By the universal custom of the port of New Haven, which custom was known, understood and assented to by the libellants, and in conformity with which custom the contract evidenced by the bill of lading hereafter recited was entered into by them, coal consigned to a railroad company, or to consignees upon the line of a railroad company, and which coal is to be transported by the railroad company, as an intermediate carrier, must be delivered to said company in its coal cars, unless some other place of delivery is expressed in the bill of lading. The said New Haven and Northampton Company, for the convenient, speedy and economical delivery of said coal, has erected upon the canal dock derricks furnished with buckets or tubs, which derricks and buckets are operated by steam power. The buckets, being lowered upon the deck of a coal barge lying alongside of the dock, are filled with coal by shovellers upon the vessel, who are paid by the owners of the barge, and the buckets are moved by steam power over the coal car, and the contents are dumped into the car. For the use of this machinery and these appliances, the railroad company receives ten cents per ton from the barge owner. This method of delivery is the ordinary one, and is the method which the railroad company has provided, both for its own accommodation and for that of the barge owners. In the present condition of the wharf, which is traversed on one side with railroad tracks, which are being occupied with cars and engines, the only practicable method of delivery, and the only practicable place from which delivery can be made, is under the derricks. The duty of the shovellers is swiftly to fill the buckets from the vessel. Prior to September 4th, 1871, the shovellers were always selected by the captains of the barges, and were paid directly by them. On that day said railroad company established the following rule, printed copies of which were posted conspicuously upon the wharf: 'New Haven and Northampton Company. Special notice. All coal vessels discharging at the dock of the New Haven and Northampton Company will be under control of the dock-master from time of arrival till discharged, and he will furnish men to discharge their cargoes. Chas. N. Yeamans, Vice-Pres't and Supt. M. C. Parker, Gen. Freight Agt.' Under this notice, the railroad company has claimed the exclusive right to furnish, at the regular price, shovellers to discharge coal cargoes, and to refuse to receive coal unless these shovellers, so furnished at such regular price, were employed by the barge captains; and, if this latter rule is not embraced in the notice, there has been such a rule, in addition to the notice, well understood by the owners of barges generally, and by the libellants. The libellants have known that the railroad company would not allow coal to be discharged at their wharf, except by shovellers whom they selected and furnished to the captains. The company has derived no pecuniary benefit from furnishing the shovellers, who were paid nothing except for shovelling, and who performed no service for the company. They were paid from September 4th, 1871, to the date hereafter mentioned, uniformly ten cents per ton, which sum was paid by the captains of the barges to the dock-master, with the amount of the bill for hoisting and dumping, and by him paid to the shovellers. This rule was adopted by the company because they deemed its adoption to be a convenience and benefit to the freighting public. Previous to the time of its adoption, a strike had occurred among the shovellers, and delays had occurred arising from the shovellers absenting themselves, or deserting after they had been hired. Since the adoption of the rule, delivery of coal has been more rapidly conducted, and fewer delays have occurred. The consignees of coal deem the rule a reasonable one. From September 4th, 1871, until a short time prior to April 22d, 1876, the uniform price for shovelling, in New Haven, had been ten cents per ton. In the spring of that year, this price began to break, and coal was shovelled at other wharves at eight cents per ton, and good shovellers could easily be obtained at that price. The general and customary price in New Haven had not, however, then dropped to eight cents, and had not been lowered at the canal dock. The officers of the railroad company were not aware of this breakage in the market. The Derby Railroad Company has a similar rule. The New York, New Haven and Hartford Railroad Company, which receives about 250,000 tons of coal annually at its wharf, does not have such a rule. All the companies have similar facilities for hoisting and dumping, for the use of which compensation is paid by the barge owners. No question is made in regard to the reasonableness of requiring this compensation. On April 19th, 1876, the libellants, who are the owners of the barge Joseph Wilkins, received on board said boat, at Brooklyn, N. Y., 318½ tons of coal, for delivery to the Glasgow Company, at the canal dock in New Haven. The agreed rate of freight was sixty cents per ton. The Glasgow Company is a manufacturing corporation at South Hadley Falls, in Massachusetts, a place upon the line of said

railroad. Said coal was to be delivered to said railroad company, as an intermediate carrier, and was by said company to be then carried and delivered to the owners. A bill of lading, of which the following is a copy, was signed by the captain of the Wilkins: 'New York & Eastern Department, North 8th, 9th & 10th St. wharves, Brooklyn, E. D., April 19, 1876. Received, in good order, from the Philadelphia & Reading Coal & Iron Co., on board the Bt. Joseph Wilkins, whereof I am master, 318½ tons of coal, (2240 pounds each,) which I agree to deliver to Glasgow Co., Canal Dock, New Haven, danger of the seas excepted, they paying freight for the same, at the rate of 60 cts. per ton. No. 491. Advanced to captain, $9 55, for "trimming." No. of tons, 318½. Freight, per ton, 60 cts. C. F. Smith.' The libellants were aware of said rule of the railroad company in regard to shovellers, and were also aware that shovelling could be hired at eight cents per ton. Said barge arrived at the canal dock on April 22d, 1876, and the agent of the libellants informed the railroad company of its arrival, and his readiness to deliver the coal. He also said that he should employ his own shovellers, unless the railroad company would furnish laborers at eight cents per ton. He was willing to employ the shovellers whom the company might furnish, if they would furnish at eight cents. The boat was placed under the derrick designated by the company. The libellants' agent hired his shovellers at eight cents, and was ready, and offered, to enter upon the discharge and delivery of the coal, into the coal cars of the company, upon its wharf. The company refused to put on steam, or to receive the coal at that place, unless the barge employed its shovellers at ten cents per ton. The barge was removed to another point, so as to accommodate an incoming barge, and, after various interviews between the libellants' agent and one of the libellants, with the proper officers of the company, and a delay until May 1st, 1876, the stipulation mentioned in the 12th article of the libel and the 12th article of the answer was entered into, and the vessel was discharged on May 2d, 1876. Five days are allowed for discharging a 300 ton coal vessel in New Haven. The ordinary demurrage for coal vessels is six cents per ton. The said rule of the company is an unnecessary one in the present condition of the coal traffic in the port of New Haven. I find that the 1st, 2d, 3d, 4th, 5th, 6th, 7th, 11th and 12th articles of said libel, and the 5th and 12th articles of the answer, are true. The amount of freight upon said coal, less the amount which was paid, is $171 55.

"In the above finding, I have omitted to enter into the details of various conversations between said parties, or the details in regard to the removal of the barge from one point to another, believing the same not to be necessary to the decision of the point in issue between the parties, which is the validity and reasonableness of the rule of the railroad company, which requires that coal should be unladen from vessels lying at its wharf, by shovellers selected and furnished by the company at the ordinary price which is paid for the same service at other wharves in the harbor. If the rule is valid and reasonable, there was no delivery of the coal. If the rule is invalid or unreasonable, there was a delivery, or its equivalent, an offer and tender of delivery to the person entitled to receive the coal, at the usual and reasonable time and place, and in the reasonable manner of delivery, and a refusal to accept on the part of the railroad company. In the latter event, the contract of affreightment was complied with by the libellants, and freight was earned. No question was made as to the liability of the defendants under the bill of lading, for freight, in case the railroad company improperly refused to receive the coal. The bill of lading required delivery to the defendants at the canal dock. It is admitted that the company, upon notification that the coal was ready to be discharged, replied that said cargo might be forthwith discharged, and would be received by it for the defendants. The railroad company is not merely an owner of a private wharf, having restricted duties to perform towards the public. Such a wharf owner may properly construct his wharf for particular kinds of business, and may make rules to limit and to restrict the manner in which his property shall be used (Croucher v. Wilder, 98 Mass. 322); but the railroad company is a common carrier, and its wharf, occupied by railroad tracks, is the place provided by itself for the reception of goods which must be received and transported, in order to comply with its public obligations. The coal was to be received from the vessel by the railroad company, as the carrier next in line, and thence carried to its place of destination. The question which is at issue between the parties depends upon the power of a common carrier to establish rules which shall prescribe by what particular persons goods shall be delivered to him for transportation. 'Common carriers undertake generally, and not as a casual occupation, and for all people indifferently, to convey goods and deliver them at a place appointed, for hire, as a business, and with or without a special agreement as to price. * * * As they hold themselves to the world as common carriers for a reasonable compensation, they assume to do, and are bound to do, what is required of them in the course of their employment, if they have the requisite convenience to carry, and are offered a reasonable or customary price; and, if they refuse, without some just ground, they are liable to an action.' 2 Kent, Comm. 599. A common carrier is under an obligation to accept, within reasonable limits, ordinary goods which may be tendered to him for carriage at reasonable

times, for which he has accommodation. Crouch v. London & N. W. Ry. Co., 14 C. B. 255. The carrier cannot generally discriminate between persons who tender freight, and exclude a particular class of customers. The railroad company could not establish the rule that it would receive coal only from certain barge owners, or from a particular class of barge captains. It carries 'for all people indifferently.' But, while admitting this duty, the company has declared, that, for the convenience of the public, and in order to transport coal more expeditiously, and to avoid delays, it will receive such coal only, from barges at its wharf, as shall be delivered through the agency of laborers selected by the company. This rule is a restriction upon its common law obligation. The carrier, on its part, is bound to receive goods from all persons alike. The duty and the labor of delivery to the carrier is imposed upon the barge owner, who pays for the necessary labor. The service, so far as the shovelling is concerned, is performed, not upon the property of the railroad company, but upon the deck of the vessel. The company is virtually saying to the barge owner—you shall employ upon your own property, in the service which you are bound to render, and for which you must pay, only the laborers whom we designate, and, though our general duty is to receive all ordinary goods delivered at reasonable times, we will receive only those goods which may be handled by persons of our selection. The law relating to carriers has not yet permitted them to impose such limitations upon the reception or acceptance of goods. The carrier may properly impose reasonable restrictions in regard to the persons by whom he shall deliver goods to the consignee or the carrier next in line. The delivery of goods is the duty of the carrier, for which he is responsible, and should be in his own control. Beadell v. Eastern Counties R. Co., 2 C. B. (N. S.) 509. It would not be contended that the railroad company could designate the crew upon the barge, or could select the barge captains, and I am of opinion that it has no more authority over the selection of the other employees of the barge owners. The fact that the barge owners are using, for a compensation, the derricks and tubs of the railroad company, is not material. The berths under the derricks have been designated by the company, as proper places where coal is to be received, and, under reasonable circumstances as to time, and freedom from interference with prior occupants, the incoming barges properly occupy such positions. Delivery is impracticable at the places designated by the company for delivery, without the use of the railroad company's machinery.

"It is true, that, under this rule, the delivery of coal into the cars of the railroad company has been more expeditiously performed, and has been attended with fewer delays than formerly, and that the rule has been a convenience to the consignees, but the convenience of the practice is not, of itself, an adequate reason for compelling its enforcement, if it interferes with the legal rights of others. I am not prepared to say, that, for the orderly management of an extensive through freighting business by means of connecting lines, and for the systematic and efficient transportation of immense quantities of goods, it may not hereafter be found a necessity that one or the other of the connecting lines shall be furnished with the power which is now sought by the railroad company; but, in the present condition of the coal traffic at the port of New Haven, this necessity does not exist. The power is a convenience to the railroad company. It is not a necessity for the transaction of business.

"It is not necessary to consider the inconveniences which may flow from the rule, but the case discloses one practical inconvenience which may arise. The rule presupposes that the same price is to be charged by the employees furnished by the railroad company, which is generally paid by others for the same service. When prices are unvarying, no serious trouble results. There is no alternative, however, for the barge owners, but to pay the price which the railroad company declares to be the general price, or else submit to a refusal on the part of the railroad company to accept the coal. The barge captain may be able to obtain the service at a reduced rate, as he could have done in this case, but he must pay his own employees the regular tariff which the company has established, and then have the question of rates determined by litigation. The result would be, that annoying litigation or vexatious altercations would ensue. If the barge owners are to make the payment, they should have an opportunity to make their own contracts, and to take advantage of changes in the price of labor. As matter of law, it is held that the rule is invalid, and that a valid delivery was made of the coal, whereby freight was earned in accordance with the terms of the contract. 'Damages in the nature of demurrage are recoverable for detention beyond a reasonable time, in unloading only. and where there is no express stipulation to pay demurrage.' Wordin v. Bemis, 32 Conn. 268.

"The libellants are entitled to a decree for the freight at the rate mentioned in the bill of lading, less $19 55, the amount paid, to wit, the sum of $171 55, and for damages in the nature of demurrage, for a detention for six days, being $114 66."

Simeon E. Baldwin and William K. Townsend, for libellants.

Johnson T. Platt, for claimants.

BLATCHFORD, Circuit Judge. The decision of this case in the district court was placed upon the ground, that the New Haven and Northampton Company, as a common

.carrier, had no right to impose on the canal-boat the requirement that it should, as a condition of the right to place the coal in the tubs of the company, attached to the company's derrick, employ, to place it there, shovellers designated by the company, and pay such shovellers the rate of compensation fixed by the company for such service. It is contended, in this court, by the claimants, that the district court ignored the status of the company as a wharf-owner; that the company, as the owner of the wharf, had the right to make reasonable rules in regard to the use of the wharf; that the company had a right, by statute, to exact seven cents per ton for coal discharged at its wharf, as wharfage; that the libellants' boat was not charged any such wharfage; that the use by the boat of the facilities provided by the company, in the way of derricks, hoisting engines, &c., is the use of the wharf; that all which the company did, was to refuse to allow the boat to use those facilities, and thus use the wharf, unless it would permit the coal to be shovelled into the tubs by men designated by the company; and that this was only a reasonable regulation made by the company, as a wharf owner. The difficulty with this view of the case is, that the regulation was not sought to be enforced, in fact, as a regulation of wharfage, or of the use of the wharf by the boat. There was no charge made against the boat for the privilege of making fast to the wharf; and, if any payment was to be made for the use of the wharf, by depositing the coal on the wharf, it was to be made by the claimants, who were the owners of the coal and the employers of the company. According to the well understood acceptation of a bill of lading such as the one in question here, where the coal was deliverable "to Glasgow Co., canal dock, New Haven"—the Glasgow Company being a mill owner at a place on the line of the railroad company, and the latter company being the owner of the canal dock at New Haven, with its tracks running to and on the dock, and having derricks and engines for hoisting the coal in tubs from the deck of the boat to the cars on the tracks—the coal was delivered by the boat into the tubs, and the boat paid the company so much per ton for hoisting the coal and dumping it into the cars. The boat had nothing to do with paying anything for the use or occupation of the wharf by the coal, and it paid separately for the hoisting. If the company had a right to charge the boat for tying up to, and using the spiles on, the wharf, no such charge was made. There was, therefore, no foundation for the requirement as to the shovellers, in any relation between the company as a wharf-owner and the boat.

The imposition of the requirement by the claimants' agent, as a common carrier, was not a reasonable one. In regard to this I concur entirely with the views of the district judge, in his decision in the court below. He found that the regulation was not a necessary one. If it had been necessary and indispensable, it would have been reasonable. It might, indeed, have been reasonable without being necessary. But, to be reasonable, it must be reasonable as respects both parties. In the present case, the effect of the requirement was to impose on the boat an unnecessary expense of two cents per ton of coal, for shovelling into the tubs.

There must be a decree for the libellants, in affirmance of the decree below, with costs.