BEN FRANKLIN TRANSP. CO. v. FEDERAL SUGAR REFINING CO.*

(Circuit Court of Appeals, Second Circuit.  March 13, 1917.)

No. 173.

1. SHIPPING ☞173—DEMURRAGE—CONTRACT FOR LIGHTERAGE.
    A lighterage company, under a general contract with a sugar refining company to perform lighterage service, *held* not entitled to recover demurrage for detention of its lighters by vessels to which it transported cargo, for which the refining company was not in fault, and in the absence of any provision therefor in the contract.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 570.]

2. SHIPPING ☞170—DEMURRAGE—GROUNDS OF RECOVERY.
    Demurrage, strictly speaking, can only be recovered where it is expressly reserved by charter party or bill of lading, and where there is no such reservation the remedy is by an action for damages in the nature of demurrage for wrongful detention.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 565-567.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Ben Franklin Transportation Company against the Federal Sugar Refining Company.  Decree for libelant, and respondent appeals.  Reversed.

The Ben Franklin Transportation Company, hereinafter called the Transportation Company, is a corporation organized and existing under the laws of the state of New York, and is engaged in the business of lightermen and transporting freight and cargoes and the like for hire.  The Federal Sugar Refining Company, hereinafter called the Refining Company, is a corporation organized and existing under the laws of the state of New York, with its principal office in the city of New York, in the Southern district of New York, and is engaged in the business of manufacturing, selling, and dealing in sugar.

Bigelow & Wise of New York City (Ernest A. Bigelow and Carl E. Whitney, both of New York City, of counsel), for appellant.

Frederick W. Park, of New York City, for appellee.

Before COXE, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge.  It may be remarked that the caption of of this case in this court is wrong, there being a reversal of the parties as at common law; and at the trial a number of the allegations in the libel as originally filed were found to be erroneous and were amended by consent.  But no change was made in the allegation that the parties had entered into a contract for carrying freight at a certain agreed freight rate, which is specified, "plus demurrage per day while waiting at either or both ends of the route according to the prevailing rates on boats of that class for demurrage in the harbor of New York."  The suit, as indicated, is in admiralty.  The Transportation Company sues upon the contract to recover various sums of money, the whole aggregating $1,956.40, with interest on the various items, claimed to be due for demurrage, under circumstances hereinafter stated.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.
*Rehearing denied.

[1] It appears that the Transportation Company entered into a contract with the Refining Company for carrying freight, consisting of sugar and sugar products, from the refinery at Yonkers to wherever ordered by the Refining Company in and about the harbor of New York, at a certain agreed freight rate. The libel alleges that the Refining Company, in addition to freight, agreed by its contract to pay demurrage, as already stated, and that it has paid the freight charges from time to time as the bills were rendered, but in certain instances has neglected to pay charges for demurrage. It declares that bills for the demurrage were duly rendered both to the Refining Company and to the steamships to which the sugar was consigned and their agents and owners, and that in each instance where the delay was caused at the steamship end demands were made by it, in behalf of itself and in behalf of the Refining Company, but in no case has it been paid; the steamship in each case alleging that their contractual relations with the Refining Company were such that they would not pay demurrage.

The answer admits a contract and calls on the Transportation Company to produce it at the trial. It admits that it has paid the freight charges accruing under the contract and that it has refused to pay charges for demurrage, and alleges that no amount is due from it to the Transportation Company. The court has found in favor of libelant and entered a decree in the sum of $2,076.58. The transactions between the parties began in 1902 and ended in March, 1916. There was a written contract between them, and later an oral renewal thereof. The written contract merely set forth the prices to be paid and received for the carrying of freight. There is nothing in it in regard to demurrage or "charges for demurrage."

The traffic manager of the Transportation Company, after stating that his company had a contract with the Refining Company, was asked whether it provided for the payment of demurrage, and he replied that it did not, but provided simply for the payment of freight. Later the contract was introduced in evidence, and it showed that the above testimony was in accordance with the facts. He, however, stated that the Refining Company had agreed to pay his company for the time the lighters were held at the refinery end. He was asked whether that company had ever paid charges for delays at that end, and he replied, "They paid us $762 for that very thing." But an agreement to pay for delays at the docks of the Refining Company, and which were presumably due to the acts or omissions of the Refining Company itself, is clearly not an agreement to pay for delays at the vessel end, which were presumably due to the acts or omissions of the vessel to which the cargo was consigned. Nevertheless the court in its opinion declared that:

"The fact that the respondent paid this demurrage in some cases without protest leads me to the conclusion that there was a contract between the parties for the payment of the demurrage at the steamship end as well as at the refinery end."

If there ever was an agreement between these parties to pay for delays at the vessel end, it was not embodied in the written contract into which they entered, and is not disclosed in this record. The traffic manager of the Transportation Company fails to testify to the existence

of any such understanding, while stating that there was an agreement to pay at the other end. The traffic manager of the Refining Company explained the exceptional case in which his company had paid the demurrage charges at the vessel end by showing that in that case his company had collected the charges at the other end and paid over the sums so collected. In other cases he said his company had never considered itself responsible for demurrage charges at the vessel end, although it had paid such at the refinery end. He declared the Refinery Company had objected to every bill when presented for demurrage charges at the vessel end, except where it had itself collected such charges. When the representative of the Transportation Company called at his office three or four times a month, "he would speak of being unable to collect the bills from the steamship company," "but I would always tell him we were not interested in the demurrage bills." "You always told him you were not interested in the demurrage bills?" Answered, "Yes." It is evident to us from this testimony that there was no contract between these parties that the Refining Company should pay demurrage charges at the steamer end. Moreover, it is inconsistent with the existence of such a contract that the Transportation Company always presented its bills for such charges in the first instance to the steamships and then on their refusal to pay presented them to the Refining Company. Why should the Transportation Company have presented the bills to the ships, if there had been a contract with the Refining Company to pay? We can understand why in some cases the latter company should have interested itself in collecting demurrage charges from the vessels. The testimony of the traffic manager of the Refining Company makes that clear. He testified that he was in the habit of talking to the traffic manager of the Transportation Company three or four times a day and—

"when these boats were held up, for his accommodation, I said I would take it up with the people, to try and get the boats released, the same as I would with the railroad companies. Not because it was my duty to, but he thought I had a little influence."

We think his testimony also makes it clear why, in the absence of any agreement to pay demurrage at the steamship end, the Refining Company did not regard itself as responsible. He testified as follows:

"The sugar is purchased through houses here, who have European correspondents, and some pay cash against a dock receipt. We do not in any case secure room on any steamer, or ask it; the buyers of the sugar arrange with the steamer for their own room; we have nothing whatever to do with the steamer. They furnish us a permit for the shipment, which we in turn send to the refinery and hand to the lightermen; so the steamship people would not recognize us in any event, for we do not obtain the payment. Q. No one, though, really had any contract with the Ben Franklin Transportation Company except yourselves? A. No; we had a contract with them to carry our freight, but we had absolutely nothing whatever to do with the room of the steamer or the permit, except handling it from the purchaser to the lighterman."

[2] There being no express contract to pay these charges for delays in unloading at the steamship's end, we are brought to the inquiry as to the nature of the liability for demurrage charges, in the absence of an express contract. Demurrage is an allowance for the detention of

a vessel in loading or unloading beyond the time allowed for the purpose in the charter party or bill of lading. It is in the nature of extended freight, and is intended as a compensation to the vessel for the freight she might have earned during the period of detention. Ordinarily demurrage is expressly stipulated for by contract, and strictly speaking is only payable when so stipulated. In Scrutton on Charter Parties (3d Ed.) page 232, the writer defines demurrage as:

"A sum agreed by the charterer to be paid as liquidated damages for delay beyond a stipulated or reasonable time for loading or unloading."

And he goes on to point out that, when this is not fixed by agreement, the shipowner's remedy is to recover unliquidated "damages for detention." See 36 Cyc. 347, and cases there cited. In the absence of express contract, damages "in the nature of demurrage" are recoverable for a breach of the implied obligation to load or unload the cargo with reasonable dispatch. See Price v. Morse Ironworks, etc., Co. (D. C.) 120 Fed. 445; Empire Transp. Co. v. Philadelphia, etc., Iron Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623; Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334; Van Etten v. Newton, 134 N. Y. 143, 31 N. E. 334, 30 Am. St. Rep. 630; Wordin v. Beinis, 32 Conn. 268, 85 Am. Dec. 255.

Demurrage, strictly speaking, then, can only be recovered where it is expressly reserved by the charter party or bill of lading, and, where no such reservation exists, the remedy is by an action in the nature of demurrage for the damages for wrongful detention. The J. E. Owen (D. C.) 54 Fed. 185 (1893). And in 36 Cyc. 370, it is stated that, where the action is for damages in the nature of demurrage, "special assumpsit or other form of action, in which the implied promise is specially pleaded, is proper and necessary."

In the argument in this court the Transportation Company did not rely upon the contract which it pleaded, but on an implied contract which it did not plead. Counsel in his brief declares that the parties "had read into the contract between them a covenant on the part of the respondent to pay the libelant at the ship end of the route after the day of arrival and two lay days." In this case the libelant has sued upon a contractual obligation which he has not proved. The contract which he has proved does not support the allegations of the libel. The implied promise upon which he seeks upon the argument in this court to recover was not specially pleaded.

But we may add that the record fails to disclose any such implied promise. And in this connection we call attention to the case of Hagan v. Tucker, 118 Fed. 731, 55 C. C. A. 521 (1902), in the Circuit Court of Appeals in the Third Circuit. That case was somewhat similar to the one now under consideration. In that case the libelant furnished a number of barges for use as lighters by respondent's testator in his coal business in New York City and harbor. The use necessarily involved more or less delay of the barges while waiting for the transfers of their cargoes to steamships, which was a part of defendant's business. A suggestion by libelant that he should expect demurrage for such delays was met by a prompt denial of liability and notice by decedent that he would not keep the vessels on such terms. Thereafter

the business continued as before, monthly bills being presented and paid for the hire of the barges, which contained no charges for demurrage, nor were any such charges made on libelant's books until after decedent's death, when a large sum was charged against him on that account. The court below dismissed the libel, and on appeal the decree was affirmed; the court declaring:

"We agree with the conclusion that the libelant's claim for demurrage or damages for the detention of his barges is not satisfactorily established."

In the case at bar the Transportation Company began to do lighterage business for the Refining Company in 1902, and continued to do so until March, 1916, and made no demands for demurrage until October, 1916. It then began to send demurrage bills to the Refining Company. Even then it sent its bills first to the steamships, and when they declined to pay them it then sent them to the Refining Company, with the explanation that the steamships had refused to pay the charges. It has already been pointed out that, as these bills came in from time to time, the Transportation Company was informed that the respondent was not responsible for such charges and that they would have to be collected from the steamship companies. It seems to us that, if the Transportation Company thereafter continued in the service of the Refining Company, it is not in a position to assert that the latter was under any implied obligation to pay charges which it had expressly declared it would not assume. Neither is the position of the Transportation Company in this respect improved by the fact that in one instance at its request the Refining Company used its influence to collect the demurrage charges from a steamship for the Transportation Company, paying over to the latter the sum so collected.

The question whether the steamships were liable to the libelant for delays in the unloading of the cargoes from the lighters is not before us, and is not passed upon in this case. Nevertheless, we may call attention to the rule laid down in 9 Am. & Eng. Encyc. of Law, 255, where it is said:

"In courts of admiralty it seems to be settled that a contract will be implied on the part of the consignee or his assignee to unload within a reasonable time, when no time is specified in the contract, and that a libel in personam may be maintained against him for damages for breach of such implied contract. A consignee is certainly so liable, if he is also the freighter."

In this case the consignee was not the freighter. The Refining Company did not employ or enter into any contracts with the steamships. They were engaged by the buyers of the sugar, and the Refining Company had nothing whatever to do with them. In 9 Am. & Eng. Encyc. of Law, page 253, the rule as to the liability of a freighter for delay in unloading is stated as follows:

"In the absence of any express agreement as to the time for unloading, the law implies a contract on the part of the charterer or freighter to unload within a reasonable time, and if he fails to do so, through his own fault or that of his agent, he is liable for damages in the nature of demurrage for the detention of the vessel."

There is nothing in this record to show that any delays which occurred at the steamship end were due to the fault of the Refining Com-

pany, and if they were occasioned by the fault of the steamships the evidence not only does not disclose that the latter were the agents of the former, but, on the contrary, it affirmatively appears that they were not its agents.

Again, in the absence of an express agreement, damages, if properly pleaded, can only be recoverable upon proof that the delay complained of was due to some fault or negligence on the part of the respondent. The burden of proving this is upon the libelant. Riley v. Cargo of Iron Pipes (D. C.) 40 Fed. 605. And in this case there is not a scintilla of evidence to show that the Refining Company was at fault for delays at the steamer end.

Decree reversed, with costs.