DICK CHIARELLO & BROS., Inc., v. CENTRAL R. CO. OF NEW JERSEY et al.

(Circuit Court of Appeals, Second Circuit. January 15, 1919.)

No. 79.

1. SHIPPING ☞177—DEMURRAGE—NECESSITY OF CONTRACT.
    In the absence of contract, what the law calls demurrage is not recoverable for delay in discharging, and in order to recover damages in the nature of demurrage the carrier has the burden of proving affirmatively that the one sought to be charged was chargeable with some negligence, or exceeded some customary period which by implication is a part of whatever contract was made.

2. SHIPPING ☞172 — TIME FOR DISCHARGING — CUSTOM OF PORT—USE OF LIGHTERS BY VESSEL.
    Under a rule of the New York Maritime Exchange, allowing consignees of railroad ties one running day for every 50,000 feet, board measure, of ties in receiving discharge, accepting such rule as a custom of the port, a vessel carrying ties to be delivered at consignee's wharf cannot, by unloading the ties into lighters, require consignee to accept discharge at the rate of 50,000 feet per day from each lighter at the same time.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Dick Chiarello & Bros., Incorporated, against the Central Railroad Company of New Jersey and the Philadelphia & Reading Railway Company. Decree for respondents, and libelant appeals. Affirmed.

For opinion below, see 246 Fed. 327.

Respondent railways maintain a joint wharf in the Arthur Kill, where they receive for creosoting purposes ties brought to them by water. Their joint

agent bought ties throughout the Southeastern United States, the terms of purchase being in every case f. o. b. the wharf aforesaid. Vendors of some ties severally shipped their sales by three steamers, Iroquois, Mills, and Shawmut. These vessels have different owners, brought ties at differing times, and have nothing in common in respect of this litigation, except that it was convenient to unite in one suit claims respecting all the ties carried.

We infer, from such bills of lading as are in evidence, that all the ships engaged to deliver their ties at the aforesaid joint wharf, which was neither their usual berthing place nor a public wharf for discharge of general cargo. No bill of lading or any other contract in evidence makes any reference to demurrage for delay in unloading. So far as we know, neither shipper, carrier, · nor these respondents, as consignees, ever agreed to or talked of unloading delay in respect of these ties, before or at their shipment.

The Shawmut and Iroquois never went to the Arthur Kill, but discharged their ties into Chiarello's lighters at their usual unloading berths; their owners agreeing to pay Chiarello for his lighter service. The Mills did go to respondent's wharf and discharged from both sides, from one directly upon the wharf, and from the other into libelant's lighters, hired by the ship owner.

Thus, at differing times, all the ties ex Shawmut and Iroquois, and some ex Mills, were in libelant's lighters, to be delivered to respondents and on their creosoting wharf. To each lot of lighters, representing or containing cargo ex one steamer, respondents assigned one berth, as they would have done to the steamer herself. Consequently, since as many as five lighters were required to carry one steamship's quota of ties, the lighters had to and did (for the most part) unload in turn.

The Maritime Exchange of New York, has promulgated a rule "regulating the delivery of railroad ties"; it was admitted that this rule expressed the custom of the port; its substance is as follows:

"Consignees shall have twenty-four hours (Sundays and legal holidays excepted) after the vessel arrives, and the master or the vessel's agent reports, in which to furnish the vessel with a berth where she can discharge. ⁕ * *

"Lay days allowed consignees for receiving cargo shall be as follows, viz.: Twenty-four hours to furnish a berth as provided in above rule, and one running day (Sundays and legal holidays excepted) for every fifty thousand (50,000) feet board measure of the ties."

There was abundant evidence that "the usual and customary rate of demurrage" in New York Harbor on lighters such as libelant furnished for these ties was $20 per day. It also appeared that delivery of freight by lighters was frequent in the harbor, and was customary and expected, though by no means invariable, at respondents' wharf.

Libelant's demand is for payment at $20 per day for every day's delay to each lighter, caused by failure to take cargo at the rate of 50,000 feet per day from each lighter, no matter how many lighters arrived at once, and without reference to (for instance) the fact that it required five lighters to deliver the ties ex one steamer.

Hyland & Zabriskie, of New York City (Nelson Zabriskie, of New York City, of counsel), for appellant.

De Forest Brothers, of New York City (Henry De Forest, of New York City, of counsel), for appellee Central R. Co. of New Jersey.

Macklin, Brown & Purdy, of New York City (Wm. F. Purdy, of New York City, of counsel), for appellee Philadelphia & R. Ry. Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The avowed object of this litigation is not so much to effect a money recovery for this particular libelant as to obtain a decision laying down some general rule covering "lighter delivery" in this harbor, and securing to lighter owners generally compensation when their vessels are

not relieved of cargo as rapidly as the various rules of the Maritime and (probably) Produce Exchanges appear to contemplate.

The attempt must fail, if for no other reason than that there is and always must be immense diversity in the contractual arrangements of many men, one small result of which is "lighter delivery" of goods. As said in Rutherglen Co. v. Houlder, 203 Fed. at 851, 122 C. C. A. 169, there "is a wilderness of law on the subject of demurrage. Decisions depend upon the language of the various charters." This was one way of saying that identity is rare in any two contracts, or sets of phenomena, and some controlling or crucial fact must furnish a guide through a "wilderness," not only of law, but of always varying commercial transactions. In this instance the guides are these truths:

[1] (1) No one concerned with the carriage of these ties could have any claim for what the law calls demurrage, because there was no agreement therefor. Ben Franklin, etc., Co. v. Federal, etc., Co., 242 Fed. 45, 154 C. C. A. 635. The delivering carrier could never do more than demand damages for delay "in the nature of demurrage"; and in order to recover he must sustain the burden of affirmatively proving that the person sought to be charged (e. g., consignee or charterer) was guilty of "some negligence in unloading, * * * or * * * exceeded some customary period which, by implication, is a part" of whatever contract was made. Riley v. Cargo of Iron Pipes (D. C.) 40 Fed. 605.

(2) The only contracts in evidence affecting these respondents are the bills of lading, by which the steamships undertook to deliver ties at the creosoting wharf. It was nothing to respondents that the steamer employed Chiarello to complete their contracts. Assuming that lighter delivery was proper, it was in legal effect the steamship owners' delivery, and this libelant was their servant; respondents never had any contractual relation express or implied with the lighterman libelant.

(3) The rules of the exchanges do not affect those not members of the corporation making the rule, proprio vigore. Such power as they are usually said to have rests on a good general custom of observing them, and is more accurately described as a custom, expressed or defined by the rule. Like every other custom, it must usually be proved anew whenever asserted, and must always be shown to fit the facts. No court can construe a custom, as it does a general statute. Customs have legal efficacy, and often very great influence; but no one can define a custom, and then ask the courts to treat the definition like a written law.

[2] Considering the evidence in the light of the foregoing propositions, we find—

(1) That it was a usual and reasonably to be expected thing, that the steamship owners would deliver by lighters.

(2) That, had the steamer gone alongside the wharf herself, she would by custom have been entitled to (say) a delivery of 50,000 feet per day.

(3) There is no evidence whatever of any custom whereby (e. g.) a steamer having a million feet of ties on board could, after signing such bills of lading as are here in proof, put said ties on 20 lighters,

send all 20 at once to one wharf, and require the consignee to unload all the lighters in one day. Nor do we apprehend that such custom is ever likely to be provable in any port; yet such in effect is the inference libelant asks us to draw from a proven custom of unloading a "vessel" at the rate of not less than 50,000 feet per day.

(4) If we could construe a definition of custom, in this instance the exchange rule, like a statute, we should hold that "vessel" meant the vessel that contracted to carry and deliver the ties, viz., the steamship, and that therefore what was customary delivery for the steamship was proper for the lighters that represented the steamship.

But we do not ground decision on such construction, but on the broader ground that neither by contract in evidence, nor custom proved, were the respondents bound to more than they did do.

(5) In the absence of controlling contract or custom, the duty of these consignees was simply to take cargo in a reasonable time. Milburn v. Federal, etc., Co., 161 Fed. 718, 88 C. C. A. 577.

"It generally happens that there is some particular fact which distinguishes every demurrage suit from every other, so that the court * * * is compelled to go back to the underlying rules." Donnell v. Amoskeag, etc., Co., 118 Fed. at 15, 55 C. C. A. at 183.

The particular fact here prominent is that the steamships attempted to multiply the duties of the consignees by simultaneous presentation of numerous lighters. They could not thus depart from their bills of lading, which would control, even over a local custom. That libelant did not secure himself by contract with his employer, against the consequences of delay at the other end of the route, is his misfortune. Ben Franklin, etc., Co. v. Federal, etc., Co., supra.

(6) Whether if any custom (applicable to the facts) to pay damages in the nature of demurrage, had been shown, libelant would not still be required to prove actual damages, we do not decide.

Whether a customary rate of "demurrage" of $20 per day is a custom enabling one to liquidate "damages in the nature of demurrage," without proof of actual loss, is a question not necessary to decision.

Decree affirmed, with costs.