**UNITED STATES ex rel. BRUGNOLI v. TOD, Com'r of Immigration.**

(District Court, S. D. New York. July 6, 1923.)

1. **Habeas corpus** ⊜⇒92(1)—**Findings of fact based on evidence not reviewable by court.**

In habeas corpus proceedings for the discharge of an alien held for deportation, the court is without power to review findings of fact based on evidence.

2. **Aliens** ⊜⇒54—**Opinion of physician as to mental defect of alien at time of entry held not supported by any evidence.**

The certificate of a physician to the mental deficiency, at the time of entry, of an alien woman who had resided in the United States for 14 years and had in the meantime three times visited her native country, made on an examination 13 months after her last return, *held* not supported by any evidence.

3. **Aliens** ⊜⇒49—**Order of deportation, because alien had become a public charge, held not supported by any evidence.**

An order for deportation of an alien woman on the ground that she had become a public charge within 5 years after entry *held* not supported by any evidence, where the hospital in which she was treated had been paid the full amount of its charge and a bond was offered to secure payment of any future charges.

Habeas Corpus. Proceeding by the United States, on the relation of Anita Brugnoli, against Robert E. Tod, Commissioner of Immigration at the Port of New York. Writ granted.

Order affirmed, 300 Fed. 918.

Middlebrook & Borland, of New York City, for petitioner.

William Hayward, U. S. Atty., of New York City (James C. Thomas, of New York City, of counsel), for respondent.

WINSLOW, District Judge. This hearing comes on pursuant to a writ of habeas corpus issued out of this court, requiring the respondent, as commissioner of immigration at the port of New York, to produce the relator, an alien, for whom a warrant of deportation has been duly issued.

The alien is an unmarried woman, 56 years of age. She first came to this country from Italy in 1901, making her home here with her brother. She returned to her native land on two occasions for short visits, once in 1907, and again in the year 1921. Her last visit was for a short sojourn in Italy, and she then returned on the steamship Argentina, landing in New York September 21, 1921, returning with a brother and sister, first class. On this occasion she had an Italian passport, together with a certificate of an Italian physician certifying that she was in good health. The brother, who verifies the petition herein, is a naturalized citizen, is engaged in business in the state of New York, and the relator has made her home with him.

After her return to her brother's home in 1921, she continued to reside with him until about October 11, 1923, when she was sent to Bellevue Hospital for examination and observation, and a few days thereafter was admitted to the State Hospital at Ward's Island. Prior to this, and for about two months, she had been under the care of Dr.

Welker, a physician of 25 years' standing in this city. Dr. Welker was the family physician of the petitioner. His certificate, which is in evidence, states, among other things, that the patient had been under observation prior to her admission to the State Hospital, and that the first symptoms of her illness date from June, 1922, and that she developed symtoms of mental trouble in or about September and October, 1922. It further appears from the record that the patient was sent to the Manhattan State Hospital at Ward's Island, and not to a private sanitarium, on the recommendation of Dr. Welker, for the sole reason that he thought she would receive more satisfactory care in the State Hospital.

The petitioner paid promptly the amount suggested or demanded by the state authorities, to wit, $10 per month. It also appears that he was able and willing to pay whatever charges were made by the state institution, and the amount paid was all that was required of him. On December 6, 1922, a certificate of the deputy medical examiner, Bureau of Deportation, was submitted to the commissioner of immigration at Ellis Island, certifying that the alien had become a public charge in the Manhattan State Hospital for causes existing prior to landing. Thereafter the commissioner of immigration applied for a warrant of arrest under section 19 of the Act of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), on the ground that the alien was unlawfully within the United States, and that it appeared from the certificate of the deputy medical examiner that the alien had become a public charge at the Manhattan State Hospital from insanity within 5 years from her entry, from causes not shown to have arisen subsequent to entry; that she was a person of constitutional psychopathic inferiority, and that she was likely to become a public charge at the time of her entry into the United States.

Thereupon a warrant of arrest was issued and she was taken into custody. The hearing provided by law was had, the last one being at Ellis Island on January 13, 1923. Testimony was taken and documentary evidence was introduced, and on March 20, 1923, the Secretary of Labor duly issued his warrant of deportation, demanding that the alien be taken into custody and taken to Italy, on the ground that she had been found in the United States in violation of the Immigration Act of February 5, 1917, on the grounds above stated.

There are three questions before this court: (1) Was she a person of constitutional psychopathic inferiority at the time of her entry? (2) Was she a person likely to become a public charge at the time of her entry? (3) Was the alien, Anita Brugnoli, a public charge in the Manhattan State Hospital at Ward's Island within five years after her entry into the United States, from causes not affirmatively shown to have arisen subsequent thereto?

If any one of these questions be answered in the affirmative, it is the duty of this court to dismiss the writ and remand the alien to the commissioner of immigration. Immigration Act of February 5, 1917 (39 Stat. 875) § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), is as follows:

"Sec. 3. That the following classes of aliens shall be excluded from admission in the United States: All idiots, imbeciles, feeble minded persons,

epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; * * * persons likely to become a public charge. * * *"

Section 19 of the Immigration Act provides, in part, as follows:

"Sec. 19. That at any time within five years after entry, any alien who at the time of entry was a member of one or more of the classes excluded by law, * * * any alien who within five years after entry becomes a public charge from causes not affirmatively shown to have arisen subsequent to landing, * * * shall, upon the warrant of the Secretary of Labor, be taken into custody and deported. * * *"

[1] If the alien has had a fair hearing, and there has been no abuse of discretion on the part of the executive, and there is evidence to sustain the finding, it is manifest that the court cannot interfere with the order of deportation. This court cannot consider either the admissibility or weight of proof according to the ordinary rules of evidence, and, even if the court should believe that the proof was insufficient or the conclusion wrong, this court would not disturb such conclusion. The question to be considered is whether there is evidence to support the finding on which the warrant of deportation is issued. "There is no judicial power to review or reverse a finding of fact based upon evidence." Low Wah v. Backus, 225 U. S. 460, 32 Sup. Ct. 734, 56 L. Ed. 1165; Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114.

[2] The finding that the alien was a person of constitutional psychopathic inferiority at the time of her entry is based solely on the report of the examiner of the State Hospital Commission after an examination made 13 months after the alien's last entry into the country. I am unable to find any evidence whatever in the record to sustain that finding of fact. The examiner certifies to a printed form, the printed words being as follows:

"Said disabilities are, in my opinion, not due to causes arising subsequent to the time when the alien landed in the United States, and I reach this conclusion upon the following facts and through the following processes of reasoning."

Immediately after that printed paragraph appear, in typewriting, the "following facts" and the "following processes of reasoning," to wit:

"This is the case of an elderly woman, native of Italy, who has shown no improvement during his (sic) hospital residence, who is suffering from a chronic mental disease. She will continue to be a public charge. The cause of her psychosis could not have arisen subsequent to landing."

Expert or opinion evidence is, of course, entitled to weight, when the opinion of the witness is based upon recited facts or clinical history within the knowledge of the witness; but a conclusion, where the record is not only barren of any facts to sustain such conclusion, but contains evidence of probative force leading to a contrary conclusion, is worthless.

It is unquestionably true that there are many mental or physical defects which, on a mere examination made by a competent medical authority or on knowledge of an antecedent medical record, would justify a conclusion that such conditions had continued from birth or for

a given period of time prior to such examination. No such condition appears from the record before the court. The same conclusion might have been given by the medical examiner in this case, without any examination and without any knowledge of the clinical history of the patient, and would be just as valuable.

According to the statement of the certificate, the quotation includes all of the facts and all of the reasoning processes by which he reaches the conclusion. The patient had resided in this country for 14 years, had returned to Italy twice, and, if the medical conclusion is correct, then her psychosis may have developed prior to her last visit to Italy, and she could have been deported before said last return. The only evidence in the record indicates that the mental defect arose from causes originating subsequent to entry and while the alien was a resident of the United States. There is no medical certificate of mental defect at the time of entry. If there were, that might be final. Sections 4289¼i and 4289¼ii, Compiled Statutes, provide for examination of immigrants on arrival.

As to the second question, namely, that the alien was a person likely to become a public charge at the time of her entry, this is based, presumably, upon the conclusion that she was mentally defective at the time of such entry, in that she was a person of constitutional inferiority. This conclusion, of course, rests upon the premises, or lack of them, upon which the medical certificate is issued, and, as already stated, I am convinced that there is no evidence to sustain the finding that she was likely to become a public charge at the time of her entry, based upon any then existing mental defects.

The very able brief of counsel for the government is persuasive that Congress intended to exclude mentally defective aliens, and also to include them in the class of those likely to become a public charge at the time of entry, because of "the mere existence of the defect." There is no doubt in the court's mind that the legislation which resulted in the enactment of the provisions of the Immigration Law was intended to exclude mentally defective aliens, and to prevent the introduction into this country of strains of mental defects that may continue and multiply through succeeding generations, "irrespective of the immediate effect thereof on earning capacity." Senate Report 352, 64th Congress, 1st Session. The record, however, does not show any evidence that at the time of the alien's entry into this country she was a person "likely to become a public charge" at the time of her entry.

[3] As to the third question, whether the alien has in fact become a public charge in the Manhattan State Hospital within 5 years after her entry from causes not affirmatively shown to have arisen subsequent thereto, the record shows that the brother of the alien paid to the Manhattan State Hospital the only sum demanded of him from time to time, to wit, $10 per month. It appears that the amount paid is insufficient "to cover a proper proportion of the cost of maintenance and of necessary repairs and improvements," as the statute provides (Consol. Laws, c. 27, § 85).

The section of the Insanity Law referred to provides that "the commission may fix the rate to be paid," etc. If they have not fixed the rate as required by law, but have demanded a smaller sum, their omis-

sion in the performance of a duty does not change the status of the petitioner. It is uncontradicted that the alien's brother, not only paid what was demanded, but offered to pay anything that was required, and has placed in the hands of his counsel money sufficient to pay any supposed deficiency. This might not change the conditions, if it were a fact that she were, in the sense indicated, a public charge. The brother of the alien, who makes the petition, further states that he is willing to put the patient in a private sanitarium and care for her, and give any bond that may be required. He is a well-to-do business man.

In short, the record has no evidence to sustain the finding that she is a public charge, unless the hospital has voluntarily made her a public charge. If the alien should in fact become a public charge within the period prescribed by law, then proceedings may be instituted for the deportation of the alien.

The writ will be sustained, the order of deportation vacated, and the alien be discharged from custody.