### Ex parte WONG NUNG.

**WONG NUNG v. CARR, District Director, United States Immigration Service.**

Circuit Court of Appeals, Ninth Circuit. February 18, 1929.

No. 5590.

J. Edward Keating and Theodore E. Bowen, both of Los Angeles, Cal., for appellant.

Samuel W. McNabb, U. S. Atty., and Gwyn S. Redwine, Asst. U. S. Atty., both of Los Angeles, Cal., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and BEAN, District Judge.

DIETRICH, Circuit Judge. At all the times herein mentioned Wong Hin was a Chinese merchant lawfully domiciled in the United States. In the court below he instituted this proceeding by a petition for a writ of habeas corpus to test the validity of an order made by the immigration officers, directing the deportation of Wong Nung, his minor son. Relief was denied, and he brings this appeal.

On October 25, 1921, Wong Nung, then five years of age, came with his mother from China, where he was born, and was admitted

to the United States as the minor child of a domiciled Chinese merchant. Between two and three years later, while he was attending the public schools in Los Angeles, it was discovered by the public health officers that he was suffering from nodular leprosy, and on April 8, 1924, he was admitted for treatment to the Los Angeles General Hospital, where he was cared for at public expense. He remained there as a public charge until September 23, 1926, when he was released as a "noninfective," to return to his home, but in less than two months, on November 16th, he was readmitted to the hospital, where he again became a public charge.

In the meantime, on March 17, 1925, the assistant superintendent of the hospital reported the case to the appellee, who thereupon instituted deportation proceedings, and on April 9, 1925, the Secretary of Labor issued a warrant directing that the boy be taken into custody and be required to show cause why he should not be returned to China, upon the ground (1) that he was a person likely to become a public charge at the time of his entry; and (2) that he had become a public charge within five years after his entry "from causes not affirmatively shown to have arisen subsequent thereto." By the administrative officers both grounds were sustained, but it is necessary here to consider only the second. In point of law it is predicated upon section 19 of the Immigration Law of February 5, 1917 (39 Stat. 874; 8 USCA § 155) which authorizes the deportation of "any alien who within five years after entry becomes a public charge from causes not affirmatively shown to have arisen subsequent to landing."

■■ That within the prescribed period Wong Nung became a public charge the record leaves no room for doubt, and further that in the spring of 1924 he had leprosy, and still has it, in a developed form, cannot be denied. The only question, therefore, is whether he has successfully carried the burden of showing that he was not afflicted with the malady in an incipient stage at the time of his landing. The father testified that he had no disease prior to his entry, and a friend, one Quock Fou, testified that he had never heard of any member of Wong Hin's family being so afflicted. One qualified doctor also gave it as his opinion that the disease was contracted subsequently to the landing. Two qualified physicians were of the contrary opinion. The view of Dr. Carter, the assistant superintendent of the Los Angeles hospital, that it was impossible to state whether or not in its origin the disease ante-

dates the landing, in no wise aids the alien, for upon him rests the burden of proof. The case is readily distinguishable from United States ex rel. Brugnoli v. Tod (D. C.) 300 F. 913, and upon the whole we are of the opinion that the issue rests upon conflicting competent testimony, with the result that we are not at liberty to review the administrative finding, unless in some other particular the conduct of the officers was such as to render the hearing unfair.

■■ Upon an analysis of the record we find little basis for the charges of unfairness. At the original hearing, which opened April 23, 1925, and, after certain continuances, closed May 14, 1925, the evidence upon this issue consisted of the statement we have referred to as having been made by Dr. Carter, in the form of a certificate, and the testimony given by the father and Quock Fou, and that of the doctor produced as a witness by the appellant. The record in that condition the local officers forwarded to Washington, with a recommendation for an order of deportation. Apparently doubting its sufficiency to justify a warrant of deportation, the Assistant Commissioner returned it to Los Angeles on August 21, 1925, with instructions "to reopen the case and have incorporated therein such opinion as may be advanced by the Public Health Service doctors as the result of any examination they may care to make."

Responding to a request for their opinion, two doctors in the Health Service, by letter dated October 1, 1925, advised that in their judgment the alien "was infected with leprosy prior to October 25, 1921." Owing to its general character, this expression of opinion is of doubtful probative value, and the ex parte method of supplementing the record is to be deprecated. But before the record was again considered the two doctors were called for cross-examination, and were in fact cross-examined at some length, by counsel for the alien, with the result that, when finally submitted for decision, the record exhibited their sworn testimony, given in a competent manner, and the letter ceased to have any significance. The error of incorporating it in the record was thus cured.

The cross-examination of one of the two government doctors was had on December 1, 1925, and of the other on June 11, 1926. On the latter date, after the evidence was closed, counsel for the alien stated that he did not desire to file a brief, but intended to appear in person before the Board of Review at Washington. Accordingly, in compliance with his request, he was notified on June 22, 1926, that the record was going forward to

Washington, and that he should make his arrangements accordingly. Apparently in compliance with the wishes of the father, on September 13, 1926, the Commissioner General advised the district director at Los Angeles that final action in the case would be deferred for one year, but "on condition that the alien be placed in the Leprosarium in Louisiana at the expense of the alien's relatives," for the payment of which a bond in the sum of $500 was required, and at the end of that period a further report upon the condition of the alien was to be submitted.

Informed of this action, counsel for the alien expressed his satisfaction, but advised that in the meantime (apparently on September 23d) the Los Angeles hospital had discharged the alien as cured and that he was again attending school. It turns out, however, that, as hereinbefore stated, the boy had been discharged, not as cured, but as "noninfective," and in less than two months he was readmitted to the hospital on account of a further development of the disease. Thereupon his counsel was informed that it would be necessary to comply with the conditions specified in the order deferring final decision, and on January 13, 1927, after some delay incident to unsuccessful efforts again to have the alien discharged from the hospital, in response to a request from the district director that action be taken to comply with the conditions imposed by the order of September 13th, counsel for the alien wrote a letter wherein, among other things, he stated that he had advised the father of the necessity of either transporting the boy to the Leprosarium or surrendering him for deportation, that the father had failed to respond, that he was therefore unable to advise of his intentions, and that he, the attorney, would "not be responsible for him [the boy] further." He further requested that the department, through some agent, take the matter up directly with the father, in order to get him to comply with the order. Six days later the attorney wrote that the father had called, and, besides asking him to make further investigation, had authorized him to arrange for paying for the care and keep of the boy in the local hospital, adding that upon investigation he would advise further of the "intention of the parties."

Apparently no further communication passed until April 28, 1927, when the district director again made demand for action, to which the alien's attorney replied, on April 29th, that the father was unable to meet the cost of caring for him in the Leprosarium, or to pay the charges for keeping him in the local hospital, and stated that under the conditions "the father is forced to return the child to China." Delay was requested to get a medical opinion as to whether the alien's condition was then such that deportation could be safely made.

No further report was made until June, and in the meantime apparently the United States Public Health Service had become interested in the case, and, that service having volunteered to bear the expense of transporting the boy to the Leprosarium, the Commissioner General assented; and, with the approval of counsel and the father, the boy was taken to the Leprosarium some time in the early part of August, 1927.

Apparently without knowledge of what had occurred at Los Angeles, the Immigration Commissioner at New Orleans, learning of the boy's presence in the Leprosarium and of his malady, wrote to the district director at Los Angeles on August 24, 1927, requesting him to find out whether the father was able and willing to pay approximately $114 per month for treatment at the Leprosarium. In the record of the Los Angeles office is a written memorandum, dated September 3, 1927, to the effect that the father called and informed the officers that he could not pay the suggested expense of treatment, and on September 9, 1927, the district director so advised the Commissioner General at Washington. The action of the director in thus communicating directly with the father, instead of reaching him through counsel, is severely criticized by appellant. But in view of the fact that the father was the natural guardian of the alien, that he would have to bear the burden of the suggested expense, that counsel at one time had advised that he would have no further responsibility, and had requested that the officers undertake directly to induce the father to comply with the conditions of the order deferring decision, the criticism does not come with very good grace.

At no time did the alien's father or other person comply with the requirements of the conditional order of September 13, 1926, and upon September 29, 1927, while the boy was in the Leprosarium, under treatment as a public charge, the Secretary of Labor brought the matter to an end by making the order of deportation assailed by this proceeding, of which action counsel for the alien was promptly notified.

We have chosen thus to set out in considerable detail and in chronological order what occurred, for we are of the opinion that a plain narrative of the facts completely answers the several vague charges made by ap-

pellant that the officers acted arbitrarily and unfairly. Indeed, we are of the opinion that they exhibited unusual indulgence and patience.

We find no merit in the further contention that, because of the tender age of the alien, and deportation may result in separating him from his parents, the case should not be held as falling within the scope of the statute. Harsh though the consequences may be, they do not import a legislative intent to make an exception to the general terms of the law, and the course authorized by the Commissioner in his conditional order, but not followed by the father, was in accord with the humane spirit of section 22 of the Immigration Act of February 5, 1917 (8 USCA § 159)

Affirmed.