MATTER OF HARUTUNIAN

In Section 245 Proceedings

A-19230396

*Decided by Regional Commissioner February 28, 1974*

(1) The test set forth in *Matter of B—*, 3 I. & N. Dec. 323 (1948), for determining deportability as a person who has become a public charge (a determination predicated on events which have already taken place), is inapplicable to a determination of excludability under section 212(a)(15) of the Immigration and Nationality Act, as a person likely to become a public charge (a determination predicated on an opinion as to the likelihood of future events).

(2) A determination as to the likelihood of a person becoming a public charge within the meaning of section 212(a)(15) of the Act should take into consideration factors such as an alien's age, incapability of earning a livelihood, a lack of sufficient funds for self-support, and a lack of persons in this country willing and able to assure that the alien will not need public support.

(3) Applicant, who is 70 years old, who lacks means of supporting herself, who has no one responsible for her support, and who expects to be dependent for support on old-age assistance is ineligible for a visa under section 212(a)(15) of the Act, as likely to become a public charge, even though the state from which she will receive old-age assistance does not permit reimbursement. Therefore, she is ineligible for adjustment of status under section 245 of the Act, as amended.

ON BEHALF OF APPLICANT:　Emanuel Braude, Esquire
　　　　　　　　　　　　　　215 W. 5th Street, Suite 910
　　　　　　　　　　　　　　Los Angeles, California 90013

The District Director found the applicant ineligible for adjustment of status and certified this matter to the Regional Commissioner for review pursuant to 8 CFR 103.4.

The applicant, a female native of Turkey, is now stateless. She resided in Roumania from 1931 to 1970. For the reason conditional entry visa numbers were not available, she was paroled into the United States in September 1970.

The applicant submitted the instant application on October 5, 1972 seeking status as a permanent resident under the provisions of section 245 of the Immigration and Nationality Act, as amended, as a nonpreference immigrant. During the interview conducted on May 24, 1973 in conjunction with her application, it

was determined that she had been granted "old age assistance" by the California State Department of Social Welfare upon her arrival in the United States and that her monthly grant was increased from $204.00 in November 1972 to $209.00 in December 1972.

The District Director stated in part that the applicant has been on welfare since her arrival in the United States in September 1970 and denied the application on June 1, 1973 reasoning that she was excludable under section 212(a) of the Act which provides in pertinent part as follows: "Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excludable from admission into the United States: ... (15) Aliens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges. ..."

Counsel submitted a brief in response to the Notice of Certification (Form I-290C) for the Regional Commissioner's consideration wherein he stated that the "welfare" the applicant receives was, and is "old age assistance, a form of categorical aid." Counsel added as follows:

There is no provision in the laws of the State of California requiring repayment of old age assistance benefits of the type received by Haigouhi A. Harutunian (California Welfare and Institutions Code Sec. 12000, *et seq.*, and *County of Alameda v. Janssen*, (1940), 16 Cal. 2d 276, 283, 106 P.2d 11), nor is there any provision in the laws of the State of California which provides for a charge to be made against the recipient of such aid as was received by Haigouhi A. Harutunian, except where the recipient subsequently acquires property (California Welfare and Institutions Code Sec. 17403). (Amended Finding of Fact No. 8, *Emanuel Braude v. United States of America*, Civil No. 68-1973-EC).

The term 'public charge,' as used in the exclusion provisions of the Immigration and Naturalization Act (8 U.S.C. 1182(a)(15)), ... is to be defined in the same way as the phrase 'public charge' is used in the deportation sections of the Immigration and Naturalization Act. (8 U.S.C. 1251(a)(8)). (Amended Conclusion of Law No. 1, *Emanuel Braude v. United States of America, supra*). Therefore, the definition of 'public charge' used in the Immigration decision *Matter of B—*, 3 I. & N. Dec. 323, (BIA, 1948), controls this case. (This decision was approved by the then Attorney General of the United States, 3 I. & N. Dec. 337.)

Counsel's contention that "There is no provision in the laws of the State of California for repayment of old age assistance of the type received ..." by the applicant, is not free from dispute. While that statement appears to be true with regard to the individual who is the recipient of such assistance, in a decision dated December 12, 1973 by the Supreme Court of California (*Swoap v. Superior Court of Sacramento County*), the Court held that the state law requires the adult children of a recipient of public assistance under California's Old Age Security Law to reimburse the county to the extent of their

584

ability. However, for the reasons indicated below, this issue is not pertinent to the decision in the instant case.

The term "public charge" appears in sections 212(a)(15) and 213 of the Immigration and Nationality Act, as amended. That term also appeared in section 19(a) of the Act of February 5, 1917 which provided grounds for deportation.

The counsel for the applicant cites as persuasive the leading administrative decision stating the essential elements of proof of deportability for becoming a public charge within 5 years after entry, *Matter of B—*, 3 I. & N. Dec. 323 (Acting Attorney General, 1948). He also cites an unreported lower court decision interpreting a public charge bond, *Emanuel Braude v. United States*, C.D. Cal., Civ. No. 68–1973–EC, May 15, 1970. His determination rests on the proposition that the term "public charge" should be defined the same way wherever it appears in the Immigration and Nationality Act, namely in Sections 212(a)(15), 213, 241(a)(8); [8 U.S.C. 1182, 1183, 1251].

*Matter of B—*, *supra*, states that where the alien received public support he is deportable only if

1. The state by law imposes a charge for the services rendered, thereby creating a debt, to be paid by the alien or other designated persons,
2. the authorities have made a demand for reimbursement,
3. there was a failure to repay.

*Braude* expressed doubt concerning the soundness of *Matter of B—*. However, in the light of that administrative interpretation the court held that a bond provision guaranteeing that an alien immigrant would not become a public charge was not breached when the alien received old age assistance in California, since there was no obligation under California law to repay.

Applying the deportability standard contained in *Matter of B—* to the case under consideration, the Counsel for the applicant finds, as the court did in *Braude*, that under California law there is no provision for a charge to be made against the recipient of old age assistance, and he concludes that an alien dependent for support on old age assistance is not thereby rendered ineligible for a visa.

*Matter of B—* defines deportability for having become a public charge after entry. But its appraisal of the deportation statute is not necessarily controlling in relation to the provisions for exclusion. While the exclusion and deportation statutes both refer to aliens who become a public charge, it does not follow necessarily that Congress intended that the same criteria be applied in both situations. The exclusion statute deals with aliens seeking to enter and who must satisfy detailed qualitative requirements. The deportation statute dislodges an established residence.

The purpose of all rules for the interpretation of statutes is to give effect to the legislative intent. There is no invariable rule for the discovery of that intention. *United States* v. *American Trucking Associations, Inc.*, 310 U.S. 534, 542 (1940); 82 *C.J.S., Statutes,*

Sec. 311. While it may normally be assumed that identical words used in different parts of the same statute are intended to have an identical meaning, this assumption readily yields when the legislative intent requires variant meanings in different contexts.

> It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance. *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U.S. 427, 433 (1932).
>
> Words generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed, *Vermilya-Brown Co.* v. *Connell*, 335 U.S. 377, 386 (1948).

The exclusion and deportation statutes embodying the term "public charge" have been on the statute books for over 80 years in essentially the same form. Act of March 3, 1891, secs. 2, 11; 26 Stat. 1084, 1086; cf. Act of August 3, 1882; 22 Stat. 214. The accepting of a bond promising, in consideration of an alien's admission, that he will not become a public charge apparently had its origin in administrative practice earlier than 1903—Act of March 3, 1903, Sec. 26; 32 Stat. 1220. The present language of Section 213 has been in the law without essential variation since 1907. Act of February 20, 1907, Sec. 26; 34 Stat. 907.

Regarding deportability, there are no significant comments in the legislative history. *Matter of B—* went unmentioned in the 1950 and 1952 congressional reports accompanying the Act. An effort to enlarge the class of deportable aliens confined in public institutions by adding a new class to the Act, Section 241(a)(3), 8 U.S.C. 1151(a)(3), appears to have been ineffective as the result of last minute floor amendments to the legislation. *Matter of Kowalski*, 10 I. & N. Dec. 159 (BIA 1963).

The stages in decisional interpretations of the deportation statute, culminating in *Matter of B—*, *supra*, are instructive:

> 1. The words "public charge" had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute. *Ex parte Kichmiriantz*, 283 F. 697, N.D. Cal. 1922; *In re Nunez*, 18 F. Supp. 1007, S.D. Cal. 1937, reversed on other grounds, 93 F.2d 41.
>
> 2. The alien had not yet become a public charge, even though he personally was destitute and his care and support were being paid for by public funds, if there existed close relatives, ready, willing and able to pay the bill, but the appropriate government agency had failed to submit any bill. *Ex parte Kichmiriantz*, *supra*; *Brugnoli* v. *Tod*, 300 F. 913, S.D.N.Y. 1923, affirmed 300 F. 918; *Donatello* v. *Commissioner*, 4 F.2d 808, E.D.N.Y. 1925; *Nocchi* v. *Johnson*, 6 F.2d 1. (C.A. 1, 1925); *Ex parte Orzechowska*, 23 F. Supp. 428, D. Ore. 1938.

3. The alien had not become a public charge where the alien's mother had offered to make reimbursement, but under state law payment could not be accepted for maintenance and treatment of the institutionalized alien. *Matter of V—*, 2 I. & N. Dec. 78 (BIA 1944).

4. The alien had not become a public charge where the circumstances were like those described in 3, above, except that no one had offered reimbursement. *Matter of B—, supra*, 3 I. & N. Dec. 323 (Acting Attorney General 1948).

In these four steps we observe a complete reversal of emphasis on the importance of the factor of ability to make reimbursement:

1. No one could pay—deportable.

2. No one had paid, but a relative could—not deportable.

3. No one had paid; a relative, though not obliged to, was willing—not deportable.

4. No one could pay and no one was obliged to—not deportable.

Even though the burden in cases 3 and 4 above falls on the taxpayers, there are cogent reasons for inferring a legislative intent (bearing in mind a resident alien's stake in this country) to construe the deportability provision favorably toward the alien. Cf. *Yamataya* v. *Fisher*, 189 U.S. 86 (1903); *Fong Haw Tan* v. *Phelan*, 333 U.S. 6 (1948); *Wong Yang Sung* v. *McGrath*, 339 U.S. 33 (1950); *Kwong Hai Chew* v. *Colding*, 344 U.S. 590 (1953); *Rowoldt* v. *Perfetto*, 355 U.S. 115 (1957); *Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963); *INS* v. *Errico*, 385 U.S. 214 (1966); *Woodby* v. *INS*, 385 U.S. 276 (1966). These and other cases have permeated the deportation statutes, both substantive and procedural, with a rule of strict construction. Cf. Gordon & Rosenfield, *Immigration Law and Procedure*, Sec. 4.1c.

The legislative history of the exclusion statute, Section 212(a)(15), is somewhat more revealing of congressional intent. Mention has been made of the early adoption of the term "public charge". In 1915 the Supreme Court ruled in *Gegiow* v. *Uhl*, 239 U.S. 3, that immigrants destined to a particular city were not excludable as persons likely to become a public charge on the basis of lack of job opportunities there. The court ruled that the exclusion ground rests on "permanent personal objections" irrespective of economic conditions. In order to nullify this restrictive interpretation of the statute Congress amended the exclusion section when it reenacted it in the Immigration Act of February 5, 1917 by relocating the phrase in question, moving it away from "paupers", etc. S.Rep. 352, 64th Cong., 2d Sess., April 17, 1916. Several courts promptly questioned the efficacy of the amendment and affirmed the interpretation that a "person likely to become a public charge" is one who for some cause is about to be supported at public expense "by reason of poverty, insanity and poverty,

disease and poverty, idiocy and poverty ...". *Ex parte Mitchell*, 256 F. 299, N.D.N.Y. 1919; *Ex parte Sakaguchi*, 277 F. 913, C.A. 9, 1922.

The 1950 Omnibus Report of the Senate Judiciary Committee, preceding adoption of the Immigration and Nationality Act, had an extensive discussion of persons excludable as likely to become a public charge. S.Rep. 1515, 81st Cong., 2d Sess., April 20, 1950, pp. 346–350. Noting that courts had given varied definitions to the phrase, the subcommittee recapitulated the holdings. A relevant portion, with citations deleted, reads:

> The financial status of an alien, although not the only criterion, has been considered along with other elements.
>
> Thus, an alien who owned a business in this country was held not to be deportable under the "public charge" provision, even though he was unable to read English or any other language. An illiterate widow of 70 with only $100 in hand and $1,000 in postal savings in Italy, and with no one obligated to support her, was excluded as likely to become a public charge.
>
> An alien's physical condition as it related to his ability and capacity for employment was considered, and the fact that an alien's passage to this country had been paid by another has been considered evidence, although not necessarily conclusive evidence, of the alien's ability to care for himself. P. 348.

The mentioned case of the 70-year-old widow is *Minuto* v. *Reimer*, 83 F.2d 166, (C.A. 2, 1936). The subcommittee's conclusion, in pertinent part was:

> The subcommittee recommends that the clause excluding persons likely to become public charges should be retained in the law. Since the elements constituting likelihood of becoming a public charge are varied, there should be no attempt to define the term in the law, but rather to establish the specific qualification that the determination of whether an alien falls into that category rests within the discretion of the consular officers or the Commissioner. P. 349.

In Section 212(a)(15) of the 1952 Act, Congress inserted the words "in the opinion of" (the consul or the Attorney General) with the manifest intention of putting borderline adverse determinations beyond the reach of judicial review. Cf. *Dolenz* v. *Shaughnessy*, 206 F.2d 392, (C.A. 2, 1953).

There is a paucity of interpretive precedent decisions in modern times. The administrative authorities have adopted the view that, while economic factors should be taken into account, the alien's physical and mental condition, as it affects ability to earn a living, is of major significance. *Foreign Affairs Manual*, Part III, Vol. 9, Note 1 to 22 CFR 42.91(a)(15); *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421–423 (AG, 1964).

We have remarked that the deportation statute must be strictly construed. The rule is otherwise as to exclusion. An unadmitted alien has no constitutional right of entry into this country. *Turner*

v. *Williams,* 194 U.S. 279, 292 (1904); *Knauff* v. *Shaughnessy,* 338 U.S. 537 (1950); *Shaughnessy* v. *Mezei,* 345 U.S. 206 (1953); *Kleindienst* v. *Mandel,* 408 U.S. 753 (1972). Congress has been concerned almost continuously since 1875 with the quality of prospective entrants, and the pattern generally has been one of increasing control. *Kleindienst* v. *Mandel, supra,* at p. 761. Contrary to their attitude in deportation cases, the courts without exception have sustained Congress' plenary power to make rules for the admission of aliens and to exclude those who possess characteristics which Congress has forbidden. *Boutilier* v. *INS,* 387 U.S. 118 (1967); *The Chinese Exclusion Case,* 130 U.S. 581, 606 (1889); *Kleindienst* v. *Mandel, supra,* at p. 766. With this in mind we consider that it would be incorrect to interpret "public charge" in Section 212(a)(15) as narrowly as in the deportation section. Everything in the statutes, the legislative comments and the decisions points to one conclusion, that Congress intends that an applicant for a visa be excluded who is without sufficient funds to support himself, who has no one under any obligation to support him and who, being older, has an increasing chance of becoming dependent, disabled and sick. Cf. *Minuto* v. *Reimer, supra.*

Nor can there be any doubt that old age assistance is individualized public *support* to the *needy,* as distinguished from *essentially supplementary* benefits, directed to the general welfare of the public as a whole. 42 U.S.C. 306.

It is a well established fact that an applicant for adjustment of status under Section 245 of the Act is in the same posture as though he were an applicant before an American consular officer abroad seeking issuance of an immigrant visa for the purpose of gaining admission to the United States as a lawfully permanent resident.

In considering the factors discussed above, it becomes clear that under the provisions of Section 241(a)(8) the determination of deportability is made upon the basis of the alien having already become a public charge; that such determination is predicated on an event that has actually transpired, thus making demand for reimbursement, and reimbursement, feasible elements. However in Section 212(a)(15) the determination of excludability is based upon an opinion of whether the alien is likely to become a public charge at some future time, a predication which necessarily precludes the element of reimbursement. Therefore, in our opinion any alien who is incapable of earning a livelihood, who does not have sufficient funds in the United States for his support, and has no person in the United States willing and able to assure that he will not need public support is excludable as likely to become a

589

public charge whether or not the public support which will be available to him is reimbursable to the state.

It is our conclusion that an older alien, who lacks means of supporting herself, who has no one responsible for her support and who expects to be dependent for support on old age assistance is ineligible for a visa under Section 212(a)(15) of the Act, as likely to become a public charge, even though the state from which she will receive old age assistance may not permit reimbursement.

In view of the above, it is determined that the record establishes that the applicant is excludable under the provisions of Section 212(a)(15). Accordingly, the District Director's decision denying the application will be affirmed.

**ORDER:** *It is ordered* that the denial decision of the District Director be affirmed.